UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MITCHELL ELLERBE | : | No. 3:12-cv-00580 (MPS) |
| | : | |
| v. | : | |
| | : | |
| OFFICER JASION, ET AL. | : | March 11, 2015 |

_____

**RULING ON PENDING MOTIONS**

**I.    Procedural History**

Plaintiff Mitchell Ellerbe is an inmate at MacDougall-Walker Correctional Institution in

Suffield, CT. He commenced this civil rights action pro se against employees of the State of

Connecticut Department of Correction.

In its February 1, 2013, initial review order, the Court dismissed all claims against

Deputy Warden Powers, Captain Butkiewicus, Grievance Coordinator Peterson, and Counselor

Supervisor Davis and dismissed the claims against defendants Correctional Officers Jasion and

Tye, Correctional Treatment Officer DiCioccio, Disciplinary Hearing Officer Pensavalle,

Investigator Krob, Director of Offender Classification Milling, District Administrator Lajoie, and

Deputy Commissioner Dzurenda in their official capacities. The Court concluded that the claims

of excessive force and denial of due process would proceed. On March 20, 2013, Ellerbe filed an

amended complaint asserting the same claims of excessive force and denial of due process

against Jasion, Tye, DiCioccio, Pensavalle, Krob, Milling, Lajoie, and Dzurenda.

On April 23, 2013, the defendants moved to dismiss the claims for injunctive and

declaratory relief and the claims against Counselor Supervisor Griggs and Krob. On November

20, 2013, the Court granted the motion to dismiss as to the claims under the Equal Protection

Clause of the Fourteenth Amendment, the claims for declaratory and injunctive relief, and all claims against Krob, and denied the motion to dismiss as moot as to Griggs because he was not listed as a defendant in the amended complaint. The Court also dismissed the conspiracy claims against Tye, Jasion, Krob, DiCioccio, and Pensavalle, and the claims that the defendants violated Ellerbe's rights under the Universal Declaration of Human Rights pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

On March 12, 2014, the Court granted Ellerbe's motion to file a second amended complaint. The Court noted that the ruling on the motion to dismiss remained in force as to all defendants other than Griggs. The Court permitted Griggs to file a motion to dismiss on or before April 2, 2014.

Pending before the Court are: (1) a second motion to dismiss filed by the defendants, seeking dismissal of the due process claims in the second amended complaint against Griggs, DiCiccio, Dzurenda, Milling, Lajoie, and Pensavalle; and (2) Ellerbe's motion for appointment of counsel. As detailed herein, the motion to dismiss will be granted in part and denied in part, and the motion for appointment of counsel will be granted.

## II.       Second Motion to Dismiss

### A.       Legal Standard on Motion to Dismiss

When considering a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009). The Court considers not whether the plaintiff ultimately will prevail, but whether he has stated a claim upon which relief may be granted so that he should be entitled to offer

evidence to support his claim. *See York v. Association of Bar of City of New York*, 286 F.3d 122, 125 (2d Cir. 2002). Although detailed allegations are not required, the complaint must include sufficient facts, "accepted as true 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting plaintiff's claim for relief. *Twombly*, 550 U.S. at 556. When ruling on a motion to dismiss, the Court may consider the allegations in the complaint, any documents attached to the complaint, and other facts of which judicial notice may be taken. *See Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir. 1993). "A document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008).

### B.    Pertinent Facts

The factual allegations are taken from the second amended complaint. On July 15, 2010, at Northern Correctional Institution ("Northern"),[1] Jasion and Tye used excessive force against Ellerbe while he was handcuffed in retaliation for Ellerbe's alleged assault of another prison staff member. Jasion issued Ellerbe a ticket for assaulting an officer in connection with Ellerbe's altercation with himself and Tye. Officers escorted Ellerbe to another cell and placed him in restraints, including a tether chain attached at his waist, that were too tight and forced him to hunch over, causing him back and neck pain. At some point—approximately July 18, 2010—

---

[1] Ellerbe has since been moved to MacDougall-Walker Correctional Institution.

Ellerbe was placed in in-cell restraints, including manacles, that caused swelling at his wrists and ankles. He was forced to eat, sleep, and use the toilet in the restraints until they were removed on July 21, 2010.

A disciplinary hearing was scheduled to address the report issued to Ellerbe for assaulting an officer. A day or two after Ellerbe was placed in his in-cell restraints, Krob visited Ellerbe as part of his investigation. Krob prepared a written summary of Ellerbe's verbal statement regarding the incident. A day or so later, Ellerbe's assigned advocate, DiCioccio, visited. DiCioccio took down a summary of his statement but refused to take down his entire statement. Ellerbe requested that DiCioccio obtain written statements from two inmates who had witnessed the incident and that DiCioccio review the videotape of the altercation between himself and Jasion and Tye. When DiCioccio met with Ellerbe again several days later (approximately July 22-23, 2010), she reported that she had obtained the witness statements but had not yet reviewed the videotape.

Ellerbe attended a disciplinary hearing on August 4, 2010. Krob read the written summary of Ellerbe's statement regarding the incident. Ellerbe made Pensavalle aware that there was more to his statement. DiCioccio did not call any witnesses to testify or offer any written witness statements. When Ellerbe questioned this, Pensavalle responded, "They're irrelevant. Inmates always lie for each other," and refused to hear witness testimony. When Ellerbe questioned whether anyone had reviewed the videotape, Pensavalle responded, "I don't have to review anything. You don't run s*** here!" Pensavalle found Ellerbe guilty and sanctioned him to thirty days Punitive Segregation (covering a partially retroactive period from July 15, 2010, to August 13, 2010), ninety days loss of commissary, and ninety days loss of telephone privileges.

4

Ellerbe appealed the decision on August 12, 2010. On September 2, 2010, Ellerbe received Lajoie's denial of the appeal. Lajoie concluded there was no serious process failure and there was sufficient evidence to support the guilty finding.

On September 3, 2010, Ellerbe participated in a hearing to determine whether he should be placed in Administrative Segregation. Ellerbe alleges that defendant Griggs presided over the Administrative Segregation and acknowledged that he had not viewed the videotape of the incident involving the alleged altercation between Jasion and Ellerbe, but indicated he would view the videotape when he got back to Walker Correctional Institution. Ellerbe claims that Griggs never watched the videotape. He also alleges that defendant Griggs did not read his prepared written statement and "excluded" his witnesses without explanation.

A few days after the hearing, Ellerbe received word that defendant Griggs had issued a decision recommending his placement in Administrative Segregation. Milling approved Ellerbe's placement in Administrative Segregation. On October 15, 2010, Ellerbe received Dzurenda's denial of the appeal.

**C.      Fourteenth Amendment Due Process Claims**

The defendants argue that Ellerbe has failed to state a claim for a due process violation because he lacked a constitutionally protected liberty interest in avoiding confinement in Punitive Segregation and Administrative Segregation and that even if the liberty interest existed, Ellerbe was afforded all the process that is constitutionally required.

**i.      Administrative Segregation Hearing (September 3, 2010)**

As to the September 3, 2010, Administrative Segregation hearing, the Court denies the motion to dismiss the due process counts for failure to state a claim, for the reasons detailed

5

below.

The Constitution itself does not give an inmate a liberty interest in avoiding more restrictive confinement such as Punitive Segregation or Administrative Segregation. *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005). But state policies regarding conditions of confinement may create a liberty interest in avoiding more restrictive confinement. *Id.* Such an interest may arise if "statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Tellier v. Fields*, 280 F.3d 69, 81 (2d Cir. 2000) (quoting *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999)).

To rise to the level of a constitutionally protected liberty interest, however, a new placement must "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). "[T]he duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). A very long period of segregation confinement—longer than 305 days—is sufficiently atypical to trigger due process protections. *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004). "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days— development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Id* at 64-65 (quotation marks omitted).

Regulations promulgated by the Connecticut Department of Correction—specifically, Administrative Directive 9.4 (Restrictive Status)—provide the basis for a liberty interest in avoiding Administrative Segregation. The version of Administrative Directive 9.4 that was in effect in 2010 defines Administrative Segregation as:

6

Placement of an inmate on a restricted housing status that results in segregation of the inmate whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates and that the inmate can no longer be safely managed in general population.

Conn. Dep't Corr. Admin. Dir. 9.4 § 3(B). The Second Circuit has held that similar language from a New York regulation creates a liberty interest:

New York has established substantive factual predicates for many instances of administrative confinement. . . . New York's regulations specify that "[a]dministrative segregation admission [the form of administrative confinement imposed on Sealey] results from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility." . . . If an inmate is to be placed in atypical confinement (considering both the conditions and the duration) after being determined, for example, to be a threat to prison safety, he should have some procedural due process surrounding the determination that he poses such a threat.

*Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

Section 12 of the Directive, the other section dealing with Administrative Segregation, does not warrant a different conclusion. The critical sentence states: "Placement of an inmate on Administrative Segregation shall be at the *discretion* of the Director of Offender Classification and Population Management *in accordance with this Directive*." Conn. Dep't Corr. Admin. Dir. 9.4 § 12 (emphasis added). While granting the Director discretion in general terms, the very same sentence clarifies that the discretion is not unlimited and must be exercised in accordance with the Directive. Section 12 also requires a timely hearing before an officer who must "examine evidence to support the classification" and specify "the reasons for or against placement in Administrative Segregation." *Id.* § 12(A), (C). While those mandated procedures do not, on their own, create a liberty interest, they support an overall interpretation that the Directive creates an expectation that inmates will not be placed in Administrative Segregation unless they have been found to pose a risk to safety or security.

7

Other courts that have considered the language of Administrative Directive 9.4 in the context of Administrative Segregation have come to the same conclusion. *Dorlette v. Butkiewicus*, No. 11-CV-1461 TLM, 2013 WL 4760943, at *14-15 (D. Conn. Sept. 4, 2013); *Alston v. Cahill*, No. 3:07-CV-473 RNC, 2012 WL 3288923, at *3-5 (D. Conn. Aug. 10, 2012); *Vandever v. Comm'r of Correction*, 106 A.3d 266, 273 n.9 (Conn. 2014); *see also Friedland v. Otero*, No. 3:11-CV-606 JBA, 2014 WL 1247992, at *13-14 (D. Conn. Mar. 25, 2014) (reaching the same conclusion with respect to portions of Administrative Directive 9.4 dealing with a different designation known as High Security Status).

The Court is aware of only two decisions from this district finding no liberty interest in relation to Administrative Segregation in Connecticut prisons, *Hamer v. Arnone*, No. 3:11-CV-279 SRU, 2011 WL 2680836, at *3 (D. Conn. July 7, 2011), and *McKnight v. Lantz et al.*, 3:09-CV-01379 AVC, 2013 U.S. Dist. LEXIS 189457, at *2 (D. Conn. Jan. 9, 2013). Neither decision analyzes the language of Administrative Directive 9.4. *See also Dorlette*, 2013 WL 4760943, at *15 n.23 (distinguishing earlier cases dealing with related issues). They instead turn on case law establishing the broad discretion granted to the Commissioner of Correction to create a system of inmate classification under Conn. Gen. Stat. § 18-81. While the Commissioner undoubtedly has such discretion, once the Commissioner has promulgated regulations as to inmate classification, those regulations may create expectations about the conditions under which an inmate will be classified in a particular way or subject to certain restrictions on liberty.

8

Similarly, the Connecticut Appellate Court held, without mentioning Administrative Directive 9.4, that placement in Administrative Segregation is discretionary. *Vandever v. Comm'r of Correction*, 42 A.3d 494, 498 (Conn. App. 2012). But that ruling was recently reversed by the Connecticut Supreme Court, which considered the language of Administrative Directive 9.4 and reached the opposite conclusion, 106 A.3d at 274 n.9, albeit in a portion of the opinion that was not necessary to the disposition of the case.

Turning to *Sandin*'s requirement that any deprivation of the liberty interest created by Administrative Directive 9.4 impose atypical and significant hardship, the Court concludes that Ellerbe's claim does not fail as a matter of law. The Second Amended Complaint does not specify how long Ellerbe remained in Administrative Segregation. But in a separate filing entitled "Motion to Oppose Defendant's Motion to Dismiss," ECF No. 23, Ellerbe alleges that the hearing before Griggs resulted in "243 days in A/S as a punishment." *Id.* at 6. Such a period of segregated confinement would ordinarily preclude dismissing a claim without fact-finding. *See Palmer*, 364 F.3d at 64-65 ("Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required.").

Given that pro se filings should be construed liberally, and the Second Circuit "ha[s] indicated the desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement," *Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir. 1997), except where there is "no indication" of atypicality, *Palmer*, 364 F.3d at 66, the question of whether Ellerbe's confinement in Administrative Segregation implicated the

protections of the Due Process Clause under *Sandin* is more appropriately considered at the summary judgment phase or at trial.

As to the procedure at the hearing, notwithstanding the label "Administrative Segregation," if "the purpose of more restrictive confinement is disciplinary or punitive," then the heightened procedural requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974) apply. *Allah v. Milling*, 982 F. Supp. 2d 172, 183 (D. Conn. 2013); *accord Sealey*, 116 F.3d at 52-53 (remanding to district court to consider whether confinement labeled as administrative "was disciplinary in nature," requiring more than the informal procedures outlined in *Hewitt v. Helms*, 482 U.S. 755 (1987)). *Wolff* requires, among other things, that "an inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566.

Ellerbe alleges that the Administrative Segregation was imposed as a punishment, and in the absence of a factual record, the Court has no basis to conclude otherwise. *See J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (declining to address whether "confinement was administrative and not punitive in nature" where "the record is devoid of any explanation as to why [the plaintiff] was confined to [segregated housing] for that period"). At this stage in the proceedings, the Court must assume that Ellerbe was entitled to *Wolff* procedures during the Administrative Segregation hearing, including the right to call witnesses and present evidence.

Although Ellerbe does not clearly allege the manner in which Griggs "excluded" witnesses and evidence, under a liberal reading of the complaint, Ellerbe is accusing Griggs of

having actively prohibited him from calling witnesses and presenting evidence. Ellerbe therefore

has stated a cognizable claim under the Due Process Clause.

> ### ii.   Personal Involvement of Milling and Dzurenda in the Due Process Violations During the September 3, 2010, Hearing

The defendants argue that the complaint makes insufficient allegations to support a

finding that Milling and Dzurenda were personally involved in the alleged due process violations

during the September 3, 2010, Administrative Segregation hearing. The Court agrees only as to

Milling and dismisses the claim against her, but will permit Ellerbe to amend the complaint to

add more specific allegations about Milling's involvement. As to Dzurenda, there are sufficient

allegations about his personal involvement for the claim against him to proceed to the summary

judgment phase.

"[A] supervisor cannot be held liable under a theory of *respondeat superior* for the

constitutional torts of his subordinates; he must be personally involved in a constitutional

violation in order to generate liability under § 1983." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d

Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

> Prior to *Iqbal,* we held that: "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring."

*Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). The Second Circuit has so far

declined to clarify the contours of supervisory liability after *Iqbal*. *Id.* at 117. This district has

generally continued to apply *Colon*, though it is unclear whether *Iqbal* overrules or limits *Colon*. *See Boyd v. Arnone*, No. 3:11-CV-824 AWT, 2014 WL 4851885, at *5 (D. Conn. Sept. 30, 2014); *Friedland v. Otero*, No. 3:11-CV-606 JBA, 2014 WL 1247992, at *10 (D. Conn. Mar. 25, 2014). *Colon* must, however, be applied in a manner consistent with *Iqbal*'s requirement that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. at 676.

At issue here is the scope of the second *Colon* category ("[T]he defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong . . . ."), which is in tension with *Iqbal*. 58 F.3d at 873. In cases decided before *Iqbal*, the Second Circuit held that a supervisor could be shown to be personally involved in a disciplinary hearing where the supervisor reviewed and affirmed the decision of the hearing officer. *Griffin v. Goord*, 66 F. App'x 245, 246 (2d Cir. 2003); *Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996); *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986). But there was no personal involvement where a supervisor merely received a letter from an inmate seeking review of a hearing and referred it to another official for decision. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997).

The Second Circuit has also noted in dicta that "it is questionable whether an adjudicator's rejection of an *administrative grievance* would make him liable for the conduct complained of." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (emphasis added). It is unclear whether this comment in *McKenna*—a case about an inmate's grievance to prison administrators concerning the prison's failure to provide medical treatment—is applicable to an appeal of a decision to impose segregated confinement. At least in Connecticut's prisons, appealing a placement in Punitive Segregation or Administrative Segregation is governed by

12

different rules than an "Inmate Grievance," which is a catch-all term for all inmate complaints *other than* appeals of specific listed decisions (a list that includes decisions to place an inmate in Punitive Segregation or Administrative Segregation). Conn. Dep't Corr. Admin. Dir. 9.6 § 4.

As a result of the tensions within Second Circuit case law and the uncertainty raised by *Iqbal*, recent decisions by the district courts in this circuit are split over whether and to what extent a supervisor's denial of an administrative appeal constitutes personal involvement. Many decisions rely on a case-by-case approach, finding personal involvement only where a supervisor's role is more active than a "rubber stamping" of the hearing officer's decision, and/or only where the supervisor's review occurs while the consequences of the hearing (segregated confinement) are still ongoing and can be remedied. *See, e.g.*, *King v. McIntyer*, No. 9:11-CV-1457, 2014 WL 689028, at *10 (N.D.N.Y. Feb. 20, 2014) (discussing those factors); *Thomas v. Calero*, 824 F. Supp. 2d 488, 508-11 (S.D.N.Y. 2011) (same); *Brown v. Brun*, No. 10-CV-0397A, 2010 WL 5072125, at *2-3 (W.D.N.Y. Dec. 7, 2010) (same). A decision in this district found personal involvement where both factors were shown—that is, the supervisor decided the appeal after an "extensive review" and was aware of the alleged due process violation "before the sanctions imposed by [the hearing officer] had expired." *Friedland v. Otero*, No. 3:11-CV-606 JBA, 2014 WL 1247992, at *10-11 (D. Conn. Mar. 25, 2014); *see also Baldwin v. Arnone*, No. 3:12-CV-243 JCH, 2012 WL 3730010, at *4 (D. Conn. June 20, 2012) (granting plaintiff leave to amend "to include specific allegations" with regard to the supervisor who affirmed the result of the hearing). This Court adopts such an approach.

Ellerbe's allegations against Milling are limited to a conclusory accusation that she "acquiesced to application of said malfeasance when she signed off and placed the plaintiff on

A/S." Second Am. Compl. ¶ 64. Under Administrative Directive 9.4, Milling's role as Director of Offender Classification and Population Management is to review a written report and recommendation provided by the hearing officer (in this case, Griggs) and issue a final decision. Conn. Dep't Corr. Admin. Dir. 9.4 § 12(C).

As to timing, the complaint is silent as to exactly when Milling became involved. But a reasonable inference drawn in Ellerbe's favor is that Milling's review occurred before or during Ellerbe's time in Administrative Segregation. Milling's actions were necessary to authorize Ellerbe's placement in Administrative Segregation. *See id.* Griggs's report was a *recommendation* to Milling, and he was required to provide it to her within three business days of the hearing. *Id.* § 12(D).

Ellerbe fails to allege that Milling's decision was anything more than a "rubber stamp," or that she even was on notice that Ellerbe believed that his due process rights had been violated. Although Milling's role—reviewing the hearing officer's recommendation and issuing the final decision—is slightly different from that of an official reviewing an administrative appeal, it shares the qualities that make review of an administrative appeal a questionable basis for personal involvement. The Directive does not require Milling to be present at the hearing or otherwise on notice of what occurred—much less actively involved in the process—and Ellerbe does not allege that she was. While it is conceivable that Griggs's report put Milling on notice that Ellerbe's due process rights were violated during the hearing, Ellerbe has made no such allegation. The fact that Milling approved the placement, in the absence of further allegations, does not amount to personal involvement in the alleged due process violations.

As to the timing of Dzurenda's consideration of Ellerbe's appeal, a reasonable inference from Ellerbe's allegations is that Dzurenda's review occurred while Ellerbe was still in Administrative Segregation. Ellerbe alleges that the appeal was decided by October 15, 2010, and that he was in Administrative Segregation for 243 days.

Ellerbe's allegations about Dzurenda's involvement are more extensive than those against Milling. Ellerbe alleges that he filed an appeal notifying Dzurenda that evidence was ignored and his due process rights were violated. Second Am. Compl. ¶ 40. He also alleges that Dzurenda's denial of the appeal specifically referenced and rejected the allegation that a piece of evidence, the videotape, was ignored, *id.* ¶ 42, and that Dzuranda "intentionally fabricated information as his basis for denying the appeal," *id.* ¶ 68. These allegations are enough to raise a reasonable expectation that discovery will reveal evidence of Dzurenda's personal involvement. Whether Ellerbe can flesh out his allegations and support them with evidence is a matter to be determined at the summary judgment phase or at trial.

The motion to dismiss the due process claim against Milling due to her lack of personal involved is granted, and the claim is dismissed without prejudice. Ellerbe may, within twenty-one days of this ruling, file an amended complaint with additional allegations *only* as to the manner in which Milling was actively involved in violating his due process rights. The motion to dismiss the due process claim against Dzurenda due to his lack of personal involvement is denied.

### iii.  Disciplinary Hearing (August 4, 2010)

As to the August 4, 2010, disciplinary hearing, the Court also finds sufficient allegations to support Ellerbe's due process claim as to Pensavalle, but not as to DiCioccio, and therefore

15

grants in part and denies in part the motion to dismiss for failure to state a claim.

Connecticut Department of Correction Administrative Directive 9.5 (Code of Penal Discipline) governs the imposition of Punitive Segregation. The version of the Directive in effect in 2010 establishes "punishment limits [that] shall be observed." Conn. Dep't Corr. Admin. Dir. 9.5 § 10(A). Punitive Segregation may only be imposed when an inmate has been found guilty of a Class A or Class B offense. *Id.* § 10(B). "[F]or Class C offense(s) – punitive segregation may not be imposed except when the criteria of Section 10(E) are met." *Id.* "A finding of guilty shall be based on evidence that the accused inmate committed the offense." *Id.* § 35. These required substantive predicates limit an officer's discretion to impose Punitive Segregation and therefore give inmates a liberty interest in avoiding Punitive Segregation.

Under the *Sandin* analysis, when it comes to periods of segregated confinement shorter than 101 days, the Second Circuit has "avoided a bright line rule that a certain period of [segregated] confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). But the Second Circuit has affirmed dismissals of due process claims "in the absence of a detailed factual record . . . only in cases where the period of time spent in [segregation] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in [segregation]—and there was no indication that the plaintiff endured unusual [segregation] conditions." *Id.* at 66.[2]

---

[2] District courts elsewhere in this circuit have dismissed claims involving periods of confinement substantially longer than thirty days where the plaintiff failed to present any allegations that might suggest unusually harsh conditions of confinement. *See, e.g., Vogelfang v. Capra*, 889 F. Supp. 2d 489, 511 (S.D.N.Y. 2012) (dismissing due process claims because three months in segregated confinement was "insufficient as a matter of law to trigger due process protections" where plaintiff "d[id] not plead any other facts tending to show that her [segregated] confinement was uniquely harsh"); *Rivera v. Lempke*, 810 F. Supp. 2d 572, 575 (W.D.N.Y. 2011) (dismissing due process claims arising from 99 days in segregated confinement because "absent unusual circumstances, [segregated]

Ellerbe alleges that defendant Pensavalle imposed sanctions of thirty days in Punitive Segregation. That period does not include the later period of confinement in Administrative Segregation imposed by Griggs and Milling, because Pensavalle is responsible only for the interval of confinement that he either imposed or extended. *See Sealey v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999). Thus, the relevant period for Pensavalle includes confinement *preceding* the hearing—and indeed, Pensavalle's thirty-day sentence was retroactively imposed to begin on July 15, 2010, the date of the incident with Jasion and Tye, when Ellerbe was first moved to a new cell and placed in restraints. Where an inmate was already confined prior to a hearing that extends the confinement, the hearing officer's duty to provide due process depends on the atypicality of the entire confinement, including the periods prior to the hearing. *Id.* at 587-88.

Ellerbe's thirty-day confinement is right at the cut-off suggested by *Palmer* for a presumptively typical confinement. But the Court cannot say that there is "no indication that the plaintiff endured unusual . . . conditions." *Palmer*, 364 F.3d at 66. Ellerbe alleges that for the first several days that he was confined in reaction to the incident with Jasion and Tye—which were also the first several days of the term of Punitive Segregation that Pensavalle imposed retroactively—he was placed in highly restrictive restraints that were painful and caused swelling, and was forced to remain in the restraints while eating, sleeping, and using the toilet for approximately three to four days. Although a developed record may ultimately show these conditions to be less than an "atypical and significant hardship," that determination cannot be made on a motion to dismiss. Ellerbe has therefore sufficiently pleaded the existence of a liberty interest in connection with the August 4, 2010, disciplinary hearing.

---

confinement of less than 101 days is not considered an atypical and severe hardship giving rise to a constitutionally

Turning to the process owed to Ellerbe at the hearing, the requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974), and its progeny apply. *Wolff* requires that "an inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566. Ellerbe's allegations against Pensavalle—that Pensavalle refused to permit witnesses because "inmate always lie for each other"—state a cognizable claim under *Wolff*.

But the allegations against DiCioccio, Ellerbe's advocate, do not state a cognizable claim. Inmates are generally not entitled to assistance of counsel, but "an assistant must be assigned to the inmate to act as his surrogate—to do what the inmate would have done were he able"—if the inmate is "illiterate, confined to [segregated housing], or unable to grasp the complexity of the issues." *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). "The assistant is not obliged to go beyond the specific instructions of the inmate . . . ." *Id.* "[A]n inmate assistant's failure to obtain testimony of witnesses requested by the inmate, or other evidence is a violation of the inmate's due process rights." *Brooks v. Prack*, No. 13-CV-6338 EAW, 2014 WL 7499458, at *10 (W.D.N.Y. Dec. 31, 2014); *see also Ayers v. Ryan*, 152 F.3d 77, 81 (2d Cir. 1998). But such a violation is reviewed for harmless error. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009).

Ellerbe alleges that DiCioccio followed through on his request to obtain written statements from two witnesses, but only took down a summary of his statement, did not review the videotape before the hearing, and did not attempt to introduce the witness statements during the hearing. It is unclear from the complaint whether the videotape was available to be

protected liberty interest" and "[p]laintiff has alleged no such circumstances here") (quotation marks omitted).

considered during the hearing—although Pensavalle's comments suggest that the videotape was available for his review if he had wished to review it—and whether DiCioccio's failure to "review" the videotape herself had any impact on Ellerbe's ability to present the videotape as evidence.

Even assuming that Ellerbe remained segregated in advance of the disciplinary hearing, could not prepare his own defense, and therefore was constitutionally entitled to an assistant, his claim against DiCioccio would fail. DiCioccio performed the crucial task that Ellerbe may not have been able to perform himself—that is, obtaining statements from the witnesses. Ellerbe was present at the hearing and able to introduce the witness statements himself, as well as to expound his own statement. The only scenario under which DiCioccio could have failed in her duty to help Ellerbe prepare for the hearing is if—going beyond the complaint's allegations and indulging large inferences in Ellerbe's favor—the videotape evidence was never made available for Ellerbe's defense, and that was because DiCioccio ignored Ellerbe's instruction to "review" the videotape.

Any such error would have been harmless. After Ellerbe objected to DiCioccio's failure to introduce the witness statements and the videotape, Pensavalle refused to consider that evidence. Any prejudice to Ellerbe arose from Pensavalle's actions, not DiCioccio's. *See Crenshaw v. Sciandra*, 766 F. Supp. 2d 478, 483 (W.D.N.Y. 2011) (no prejudice to plaintiff whose appointed assistant "did not obtain certain documents for him" because "plaintiff brought that matter to the attention of the hearing officer, who held that the documents were inadmissible"). The due process claim against DiCioccio is therefore dismissed.

###### iv. Personal Involvement of Lajoie in the Due Process Violations During the August 4, 2010, Hearing

The defendants argue that the complaint makes insufficient allegations to support a finding that Lajoie was personally involved in the alleged due process violations during the September 3, 2010, Administrative Segregation hearing. The Court agrees and dismisses the due process claim against Lajoie.

As discussed *supra* Subsection II.C.ii, a supervisor is not personally involved in a due process violation arising from a hearing when the supervisor's role is limited to affirming the hearing officer's decision after the segregated confinement imposed at the hearing has already ended. Ellerbe's time in Punitive Segregation ended on August 13, 2010, and he submitted his appeal only one day earlier, August 12, 2010. He did not receive Lajoie's decision on the appeal until September 2, 2010. There are no allegations that would permit Ellerbe to establish Lajoie's personal involvement in any due process violations connected to the August 4, 2010, disciplinary hearing. The claim against him is therefore dismissed.

###### D. Claims Addressed in Prior Ruling on Motion to Dismiss

Ellerbe has re-asserted his due process claims against Krob, his equal protection claims, his conspiracy claims, his claims for declaratory and injunctive relief and his claims under the Universal Declaration of Human Rights. In its March 12, 2014, order, the Court informed Ellerbe that its ruling on the first motion to dismiss as to various claims against the defendants would remain in force. Accordingly, the due process claims against Krob, equal protection and conspiracy claims, claims for declaratory and injunctive relief, and claims under the Universal Declaration of Human Rights are dismissed for the reasons set forth in the Court's ruling

granting in part and denying in part the first motion to dismiss. ECF No. 32.

     **E.**     **Fifth Amendment Claims**

Ellerbe alleges that the defendants violated his Fifth and Fourteenth Amendment procedural due process rights. The Fifth Amendment, however, applies to the federal government, not to the states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (holding Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466–67 (S.D.N.Y. 2009) (holding that any due process claim against the city was "properly brought under the Fourteenth Amendment, not the Fifth Amendment"). Because Ellerbe has not alleged any deprivation of his due process rights by the federal government, any Fifth Amendment claims are dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

## III.     Second Motion for Appointment of Counsel

Ellerbe seeks the appointment of pro bono counsel. When deciding whether to appoint counsel, the district court must "determine whether the indigent's position seems likely to be of substance." *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986). In *Cooper v. Sargenti*, 877 F.2d 170 (2d Cir. 1989), the Second Circuit cautioned district courts against the "routine appointment of counsel" and reiterated the importance of requiring an indigent to "pass the test of likely merit." *Id.* at 173-74. The court explained that "even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." *Id.* at 171. Once the court determines that Ellerbe meets the test of likely merit, the court will consider "plaintiff's ability to obtain representation independently, and his ability to handle the case without assistance in the light of the required factual investigation, the complexity of legal issues

and the need for expertly conducted cross-examination to test veracity." *Id.* at 172.

The Court concludes that Ellerbe's excessive force and due process claims have likely merit and should proceed. Ellerbe has made sufficient efforts to find counsel on his own. The Inmates' Legal Assistance Program has declined to assist him with the case. The Court concludes that Ellerbe has met the other factors set forth in *Sargenti* and that proper and effective judicial processing of the above-captioned matter cannot be achieved without appointment of counsel. The second motion for appointment of counsel is granted.

## IV.   Conclusion

The Second Motion to Dismiss (ECF No. 41) is GRANTED IN PART AND DENIED IN PART**.** The due process claims against Krob, equal protection and conspiracy claims, claims for declaratory and injunctive relief, and claims under the Universal Declaration of Human Rights are dismissed for the reasons set forth in the Court's ruling granting in part and denying in part the first motion to dismiss. ECF No. 32. All due process claims under the Fifth Amendment are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

As to the remaining due process claims under the Fourteenth Amendment, all claims are dismissed except those against defendants Griggs and Dzurenda in connection with the September 3, 2010, hearing, and against defendant Pensavalle in connection with the August 4, 2010, hearing. But the plaintiff may, subject to the requirements of Federal Rule of Civil Procedure 11, file an amended complaint within twenty-one days of this ruling adding further allegations about defendant Milling's personal involvement; the Court will permit amendments *only* pertaining to that issue. If the plaintiff files an amended complaint, the defendants may file a motion to dismiss the claim against Milling but must do so within fourteen days of the plaintiff's

filing.

The case proceeds as to the Eighth Amendment claims for excessive force against defendants Jasion and Tye in their individual capacities, and the Fourteenth Amendment due process claims against defendants Griggs, Dzurenda, and Pensavalle in their individual capacities.

The Second Motion for Appointment of Counsel (ECF No. 44) is GRANTED. The Court directs the Clerk to make reasonable efforts to appoint counsel for the plaintiff from the civil pro bono panel.

SO ORDERED this 11th day of March, 2015, at Hartford, Connecticut.


        /s/
        Michael P. Shea
        United States District Judge

23